

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

AMELIA FAY HANGER, )
)
   Respondent, )
)
v. ) WD81928
)
DILLON MICHAEL JAMES DAWSON, ) Opinion filed: September 17, 2019
)
   Appellant. )

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE KEVIN D. HARRELL, JUDGE**

Before Division Three: Thomas H. Newton, Presiding Judge,
Anthony Rex Gabbert, Judge and Edward R. Ardini, Jr., Judge

Dillon Michael James Dawson ("Dawson") appeals the entry of a Full Order of Protection – Child by the Circuit Court of Jackson County. He asserts two points on appeal. In his first point, Dawson argues that the trial court lacked authority to enter judgment against him, claiming it was not alleged that he had personally engaged in acts of domestic violence, stalking or sexual assault as required under chapter 455, RSMo.[1] He asserts in his second point that the Full Order of Protection – Child modified an existing child custody order in violation of section 455.523.2(1). We affirm.

---

[1] All statutory references are to RSMo 2016.

**BACKGROUND**

The facts, in the light most favorable to the judgment,[2] are as follows. Respondent Amelia Hanger ("Hanger") and Appellant Dawson shared custody of their then five-year-old son ("Child") pursuant to a custody agreement entered in a separate case granting equal legal and physical custody to both parents. In December of 2016, Dawson's mother ("Grandmother") first entered Child's life. In December of 2017, Grandmother began living with Dawson and he relied on Grandmother to watch Child when he was at work.

On February 9, 2018, Hanger arrived at Dawson's residence to pick up Child and found only Child and Grandmother present. Child was sitting in his room with the door closed eating ice cream, a situation she described as "strange." Usually, Child would enthusiastically greet Hanger when she arrived to pick him up. Hanger briefly discussed future childcare plans with Grandmother before leaving with Child.

Sensing an issue with Child, Hanger stopped at a gas station to ask if something had occurred at Dawson's residence. In response, Child explained that Grandmother had punched him in the stomach, and then, after he fled, Grandmother dragged him from a hiding spot. Hanger proceeded to her home with Child, called family and friends for support, and contacted the police to report the incident.

The following day, a social worker met with Child with Hanger present. Child explained to the social worker that he did not feel safe around Grandmother when his father was absent because she would punch him in the stomach and strike his hands and feet. The social worker also spoke with Child's principal and a school social worker.

---

[2] *See Cima v. Fansler*, 345 S.W.3d 875, 877 (Mo. App. W.D. 2011).

On February 13, 2018, Hanger filed a Petition for Order of Protection – Child against both Dawson and Grandmother.[3] In her petition against Dawson, Hanger alleged that Dawson had witnessed Grandmother abuse Child, that he had "grabbed [Grandmother's] arm to stop her" but that he continued to permit Grandmother to provide unsupervised care for Child. The trial court conducted an initial hearing on February 28, 2018. Hanger, the social worker, Grandmother, and Dawson all testified. Hanger was represented by counsel, and Dawson and Grandmother appeared *pro se*. After hearing evidence, the trial court continued the hearing until April 25, 2018. The trial court ordered that Dawson was not to "allow the minor child to be left alone with the Paternal Grandmother or to visit the residence of Paternal Grandmother while [Dawson] and his mother reside together. The minor child is not to have any visitation with Paternal Grandmother pending the investigation of these cases and the DFS investigation."[4]

At the April 25, 2018, hearing, Dawson was represented by counsel. Dawson moved to dismiss the petition arguing that section 455.505 only allows orders of protection to be entered where the respondent is directly accused of domestic violence, stalking, or sexual assault. The trial court denied the motion.

Hanger, the social worker, and Dawson testified again, as did Dawson's current girlfriend. Hanger's testimony was largely unchanged from the first hearing but she noted that she had seen Grandmother at Dawson's residence since the February hearing and, on one occasion, she found Child sleeping in Grandmother's room which was still filled with Grandmother's belongings.

---

[3] The Petition for Order of Protection filed separately against Grandmother is not at issue in this appeal, and we discuss it only to the extent that it is relevant to this case.

[4] On April 11, 2018, the trial court entered a Judgment of Full Order of Protection – Child against Grandmother.

At the close of evidence, Dawson again asserted that the trial court lacked authority to enter an order of protection against him arguing that he had not been directly accused of abuse. After the parties concluded their arguments, the trial court discussed its intention that Grandmother not have access to Child's residence, wherever that may be, and its concern that because Grandmother was on the lease for Dawson's residence, she would continue to be granted access to the home.

The trial court entered its Judgment of Full Order of Protection – Child on May 25, 2018, finding that Dawson had "abused and neglected the minor child by purposely or knowingly placing the child in fear of physical harm by allowing the child to be in the presence of [Grandmother] who this Court found represents a [credible] threat to minor child."[5] The judgment further ordered that Dawson not have "any contact with the minor child at [Dawson's] primary residence, wherever that may be." Dawson appeals.

## DISCUSSION

### Point I

For his first point on appeal, Dawson argues that the trial court erred in entering an order of protection against him because he is not a proper "respondent" under chapter 455, RSMo. He claims that entry of an order of protection is proper only against a respondent who directly commits an act constituting domestic violence, stalking or sexual assault, and that in this case, it was never alleged that Dawson engaged in such acts against Child. Rather, he argues, the Full Order of Protection - Child was entered against him for the independent acts of a third party. We disagree.

"In this court-tried case, we must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies

---

[5] The trial court also found that Dawson had allowed "Grandmother to reside at, and/or enter [Dawson's] residence where the minor child also resides, in violation of the Court's prior Orders in both the above-entitled matter, and the Full Order of Protection issued against [] Grandmother" in her case. This finding is not challenged in this appeal.

4

the law." *Cima v. Fansler*, 345 S.W.3d 875, 877 (Mo. App. W.D. 2011) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). "We view the facts and reasonable inferences in a light most favorable to the judgment and must defer to the trial court's determination of witness credibility." *Id.* "We review questions of law independently, and reach our own conclusions on the issue presented, without deference to the trial court's conclusions." *In re GF*, 276 S.W.3d 327, 329 (Mo. App. E.D. 2009) (citing *City of St. Joseph v. Vill. of Country Club*, 163 S.W.3d 905, 906 (Mo. banc 2005)).

The "primary rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning." *Young v. Boone Elec. Coop.*, 462 S.W.3d 783, 791 (Mo. App. W.D. 2015) (quoting *In re Boland*, 155 S.W.3d 65, 67 (Mo. banc 2005)). We "look beyond the plain meaning of the statute ***only when*** the language is ambiguous or would lead to an absurd or illogical result." *Id.* (citation omitted) (emphasis in original). "It is presumed that the General Assembly legislates with knowledge of existing laws." *Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 667 (Mo. banc 2010) (citation omitted). "Under the doctrine of *in pari materia*, statutes relating to the same subject matter should be construed to achieve a harmonious interpretation." *Roesing v. Dir. of Revenue*, 573 S.W.3d 634, 639 (Mo. banc 2019) (citation omitted). "A specific statute controls over a more general statute where both statutes purport to address the same issue." *Parktown Imps., Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 673 n.2 (Mo banc 2009).

Dawson argues that the trial court lacked statutory authority to enter its Judgment of Full Order of Protection – Child, claiming "[n]o allegations were made, nor findings [of] fact were set forth in the Judgment…wherein [Dawson] was said to have himself, committed acts of domestic violence, stalking, or sexual assault on the subject child." Dawson asserts that under the statutory

framework of chapter 455, RSMo, an order of protection cannot be entered against an individual based on the independent acts of a third party. In constructing this argument, Dawson mischaracterizes the trial court's findings and misconstrues the breadth of what constitutes an "assault" under the definition provided in section 455.010(1)(a).

Under chapter 455, RSMo, an order of protection may be entered in favor of a child who "has been subject to domestic violence by a present or former household member or sexual assault or stalking by any person[.]" § 455.505.1. "Domestic violence" is defined as "***abuse*** or stalking committed by a family or household member, as such terms are defined in this section[.]" § 455.010(5) (emphasis added). Relevant to this appeal, "abuse" encompasses the term "assault," which is defined as "purposely or knowingly placing or attempting to place another in fear of physical harm[.]" § 455.010(1)(a).

The gravamen of Dawson's complaint is that the trial court lacked statutory authority to enter a full order of protection against him for the "independent acts" of Grandmother. While rhetorically appealing, this characterization of the allegations leveled against him and the trial court's findings does not survive scrutiny. To be clear, the trial court made findings directed at conduct committed by Dawson. The trial court specifically found that Dawson "abused and neglected the minor child by purposely or knowingly placing the child in fear of physical harm by allowing the child to be in the presence of Paternal Grandmother" who the trial court found was a credible threat to the safety of Child.[6] Nevertheless, Dawson posits that this does not constitute a finding that ***he*** "committed acts of domestic violence" against Child. This exercise in redirecting focus from him to Grandmother collapses upon close examination.

---

[6] Dawson does not challenge the sufficiency of the evidence supporting the trial court's findings.

It bears repeating that the trial court found that it was ***Dawson*** who "plac[ed] the child in fear of physical harm." He accomplished this "by allowing the child to be in the presence of Paternal Grandmother."[7] In other words, Dawson is not being held responsible for the "independent acts" of Grandmother but instead is being held to account for his own conduct that "purposely or knowingly plac[ed] the child in fear of physical harm." Although the source of the "fear of physical harm" may have been Grandmother, that distinction does not provide a reprieve to Dawson. The plain language of the statutory definition of "assault" does not permit an individual who "purposely or knowingly plac[es] or attempt[s] to place another in fear of physical harm" to escape a full order of protection under chapter 455, RSMo, simply because the physical harm feared might be from the hands of a third party.[8] *See In re KCP&L Greater Mo. Operations*

---

[7] Dawson does not cite to a single case holding that a full order of protection under chapter 455 can only be entered against an individual for domestic assault if that individual is also the source of the "fear of physical harm." Instead, Dawson and the dissent rely on cases such as *Reno v. Reno*, 461 S.W.3d 860 (Mo. App. W.D. 2015). While *Reno* did not involve chapter 455, it did include allegations made against a father that his "mother ha[d] struck [one of the children] while in [Father's] care." *Id* at 865. On appeal, it was found that the trial court did not abuse its discretion in determining a claim that "a third party once struck a child, without more, does not state a claim of parental abuse." *Id.* By contrast, this case does not involve an isolated allegation of physical abuse by Grandmother and, additionally, Dawson was found to have acted "purposely or knowingly" in placing the child in "fear of physical harm." Dawson's knowledge and purpose was revealed by his actions during the pendency of the proceedings before the trial court. As previously noted, the trial court specifically ordered after the first hearing in this matter that Dawson was not to allow the minor child to be left alone with Grandmother or to visit the residence of Grandmother while Dawson and Grandmother lived together. In addition, between the first (February) and second (April) hearing, a full order of protection was issued against Grandmother relating to Child. Despite its clear admonitions, the trial court found that Dawson (after the first hearing) violated its order by "allowing Paternal Grandmother to reside at, and/or enter [Dawson]'s residence where the minor child also resides…." This finding is not challenged by Dawson on appeal and, to the extent that *Reno* is instructive, and setting aside Dawson's abusive conduct prior to the initiation of these proceedings, Dawson's violation of the trial court's order during the pendency of this case by itself constitutes the "more" that was lacking in *Reno*.

[8] This conclusion is further highlighted by the general assembly separately including "battery" within the definition of "abuse." "Battery" is defined as "purposely or knowingly causing physical harm to another with or without a deadly weapon." § 455.010(1)(b). Thus, while "abuse" by "battery" would require the respondent to be the individual who "caus[ed] physical harm to another[,]" an individual satisfies the definition of "assault" by "placing another in fear of physical harm" without regard to whether the individual is the source of the fear. Under the view advocated by Dawson and the dissent, an individual could avoid entry of a full order of protection by using a third-party surrogate as the instrumentality of the fear. There is nothing in the definition of "assault" that would permit such an illogical outcome.

7

*Co.*, 408 S.W.3d 175, 186 (Mo. App. W.D. 2013) (where a statute is unambiguous, the court will give effect to the language as written).

Dawson was found to have "knowingly or purposely" placed Child in "fear of physical harm by allowing the child to be in the presence of Paternal Grandmother" and that conduct, committed by Dawson, constituted abuse under section 455.010(1)(a) and formed a proper basis for the trial court's entry of the Full Order of Protection - Child.

Point I denied.

## Point II

In his second point, Dawson argues that the Full Order of Protection - Child entered against him modified an existing custody order involving Hanger, Dawson and Child by restricting his right to have visitation with Child at his primary residence in violation of section 455.523.2(1).

Section 455.523.2(1) states that:

> When the court has, after hearing for any full order of protection, issued an order of protection, it may, in addition: (1) [a]ward custody of any minor child born to or adopted by the parties when the court has jurisdiction over such child and no prior order regarding custody is pending or has been made, and the best interests of the child require such order be issued[.]

The language of this provision is clear: following a hearing on a full order of protection, a condition precedent to a trial court awarding custody of a minor is that there exists "no prior order regarding custody." It is undisputed in this case that there was a "prior order regarding custody" of Child pending when the trial court issued its Final Order of Protection – Child. Therefore, the relevant question is whether the provision in the Full Order of Protection – Child prohibiting visitation with Child at Dawson's residence constituted a custody award. We find it did not.

The complained about provision in the Full Order of Protection – Child only restricted *where* Dawson could exercise his visitation with Child. It did not alter the frequency or duration

8

of Dawson's visitation rights under the previously entered custody agreement. Indeed, the trial court went to great efforts to make clear the terms of the Full Order of Protection - Child did not "supersede" the provisions of the underlying custody agreement establishing when and for how long each party had custody of Child.[9] As a result, we find that the restriction imposed by the trial court on the location of Dawson's visitation with Child did not constitute a custody award and thus section 455.523.2(1) was not violated.

The dynamics of the underlying family situation provide additional clarity to the trial court's rationale for prohibiting Dawson from having contact with Child at his residence. The trial court found Grandmother to be a credible threat to the safety of Child and had entered a Full Order of Protection against her. Grandmother was also a party on the lease for Dawson's residence and thus had a legal right to be present at that property. Moreover, Dawson had, during the pendency of this action, defied the trial court's order that prohibited Child from being in the presence of Grandmother or visiting the residence of Grandmother while she and Dawson lived together. Based on these findings relating to Grandmother as well as Dawson's historical actions in direct contradiction of a court order, the trial court properly fashioned a remedy that protected Child without interfering with the existing custody arrangement.[10]

Point II denied.

---

[9] Through a series of footnotes in the Final Order of Protection – Child, the trial court made clear that the restrictions contained in its order did not "supersede the 'Weekday and Weekend Schedule,' 'Summer Schedule,' or 'Holiday Schedule' set forth" in the underlying custody case.

[10] The trial court made clear to the parties at the conclusion of the trial that it would entertain a motion to modify its judgment once circumstances relating to Grandmother's living arrangement had changed.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
EDWARD R. ARDINI, JR


Newton, J. concurs
Gabbert, J. dissents in a separate opinion



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

AMELIA FAY HANGER,        )
                                    )
        Respondent,        )
                                    )
v.                                )        WD81928
                                    )
DILLON MICHAEL JAMES DAWSON,  )        Opinion filed:  September 17, 2019
                                    )
        Appellant.        )

## DISSENTING OPINION

I respectfully dissent.  I would find that the circuit court erred in entering a Full Order of Protection – Child against Dawson and would have reversed the judgment.  I would grant Appellant's first point on appeal, finding that the court lacked the statutory authority to enter an order for assault due the acts of a third party.  Because I would reverse on Point I, I would dismiss Point II as moot, but I otherwise do not take issue with the majority's reasoning on Point II.

Although I agree with the facts set forth by the majority, there are additional facts relevant to my analysis.

In December of 2017, when Dawson began relying on Grandmother to watch Child when he was at work, in most instances Dawson's sister was also present watching Child.  On the day Hanger picked up Child, when the incident of abuse was first reported, the future childcare plans she discussed with Grandmother involved Grandmother staying with Hanger to help with Child while Dawson was on an extended trip out of town.

When the social worker met with Child and Hanger, Child was difficult to understand at times, and Hanger would explain his responses to the social worker when necessary. The social worker also reported that there were no physical signs of abuse present on Child's body. When the social worker spoke with Child's principal and school social worker, both reported that they had never observed any signs of abuse.

After the initial hearing, the circuit court issued a temporary order that Dawson not allow Child to be alone with Grandmother or to visit her residence "while [Dawson] and his mother reside together." During the second trial on April 25, 2018, the social worker testified that she had completed her investigation of the abuse allegations against Grandmother since the initial trial, and she found that there was insufficient evidence to conclude that Child had been abused by Grandmother. She also testified that Child stated that he felt safe with Dawson, and only felt unsafe at Dawson's home when Dawson was away at work.

Dawson's current girlfriend testified that she regularly watched the Child while Dawson was working, and that Dawson and Child routinely stayed at her house. She also testified that to her knowledge, Grandmother had not had any contact with Child since the court entered its initial order. Dawson testified that prior to the court entering a permanent order against Grandmother, she would stay with friends on the days Child was with Dawson, and would then return to the home after Child left. Dawson testified that after the court made its order against Grandmother permanent, she began moving out in earnest, though she continued to store personal belongings at his house while she stayed with friends and searched for a new residence. Dawson also testified that Grandmother had not had any contact with Child whatsoever since the court entered its initial order in February. In regards to Child's statement that Grandmother would hit Child and that Dawson would stop her, he described "power ranger" and "zombie" games the three would play

around the house, and suggested that Hanger was confused by Child's description of what was play and not abuse.

As the court was discussing its intention that Grandmother not have access to Child, counsel for Dawson and the court had the following exchange:

> Counsel: So I'm a little confused, Judge. Is this going to be a final order or is this going to be a temporary order?
>
> The Court: Well, it's going to be – right now it's going to be an order until I guess you file a motion for your client stating that circumstances have changed.
>
> Counsel: It's going to be – take the fashion of an order of protection?
>
> The Court: Yes.
>
> Counsel: Okay. So is there a finding of abuse, then, perpetrated by my client?
>
> The Court: There's a finding of that the child will be protected from his grandmother, paternal grandmother, who lives with your client…Who your client has allowed to be around the abuser who this court has already issued an order of protection against.

The discussion continued, with counsel continuing to argue that the court could not enter this order absent a finding of abuse, and that if the court felt that Dawson violated the initial, temporary order, the appropriate action would be to hold Dawson in contempt, rather than enter a protection order not authorized by statute. In response to counsel's argument that it cannot enter an order in response to perceived contempt and without a finding of abuse, the court stated as follows:

> The Court: All right. Just so you're very clear. I'm finding abuse and neglect by way of allowing the minor child to stay in the presence of one [Grandmother], who this court has found and given an order of protection on April 11, and also after issuing an order back in February. So I'm finding abuse and neglect on behalf of your client. So the record is very clear now; right?

The proceedings then concluded.

On May 1, 2018, Hanger submitted a proposed judgment. The circuit court entered its Judgment of Full Order of Protection – Child on May 25, 2018, adopting all of Hanger's proposed

3

language verbatim and adding footnotes clarifying that the order did not supersede the existing custody order.

## DISCUSSION

I agree with the majority's summation of Dawson's argument, though I would add that in arguing that the circuit court exceeded its statutory authority in entering the order, he argued that the court found that he neglected Child, an act that does not appear anywhere in the subject statute as justification for an order of protection. Of the canons of statutory construction cited by the majority, there are two I would emphasize as particularly relevant to my analysis of this issue: "Statutes relating to the same subject matter should be construed to achieve a harmonious interpretation" according to the doctrine of *in pari materia*, and a specific statute should control over a more general one.

Section 455.505[1] states that an order of protection may be entered for a child who "has been subject to domestic violence by a present or former household member or sexual assault or stalking by any person." The Child Protection Orders Act, comprised of Sections 455.500 through 455.538, does not define domestic violence, but Section 455.010, appearing earlier in the chapter, does.[2] Section 455.010 states, in pertinent part, as follows:

> As used in this chapter, unless the context clearly indicates otherwise, the following terms shall mean:
>
> (1) "Abuse" includes but is not limited to the occurrence of any of the following acts, attempts or threats against a person who may be protected pursuant to this chapter, except abuse shall not include abuse inflicted on a child by accidental means by an adult household member or discipline of a child, including spanking, in a reasonable manner:
>
> > (a) "Assault", purposely or knowingly placing or attempting to place another in fear of physical harm;

---

[1] All statutory references are to the Revised Statutes of Missouri, RSMo 2016, unless otherwise specified.

[2] Section 455.501, RSMo 2000, provided definitions for the Child Protection Orders Act until its repeal in 2011.

4

(b) "Battery", purposely or knowingly causing physical harm to another with or without a deadly weapon;

(c) "Coercion", compelling another by force or threat of force to engage in conduct from which the latter has a right to abstain or to abstain from conduct in which the person has a right to engage;

(d) "Harassment", engaging in a purposeful or knowing course of conduct involving more than one incident that alarms or causes distress to an adult or child and serves no legitimate purpose. The course of conduct must be such as would cause a reasonable adult or child to suffer substantial emotional distress and must actually cause substantial emotional distress to the petitioner or child. Such conduct might include, but is not limited to:

   a. Following another about in a public place or places;

   b. Peering in the window or lingering outside the residence of another; but does not include constitutionally protected activity;

(e) "Sexual assault", causing or attempting to cause another to engage involuntarily in any sexual act by force, threat of force, duress, or without that person's consent;

(f) "Unlawful imprisonment", holding, confining, detaining or abducting another person against that person's will…

Section 455.010 later defines "Respondent" as "the family or household member alleged to have committed an act of domestic violence, or person alleged to have committed an act of stalking or sexual assault, against whom a verified petition has been filed or a person served on behalf of a child pursuant to section 455.503."  At no point does Section 455.010, or all of Chapter 455 for that matter, discuss "neglect."

One does find "neglect" elsewhere in Missouri statutes.  Section 211.031 states, in pertinent part, as follows:

1.  Except as otherwise provided in this chapter, the juvenile court or the family court in circuits that have a family court…shall have *exclusive original jurisdiction* in proceedings:
   (1) Involving any child or person seventeen years of age who may be a resident of or found within the county and who is alleged to be in need of care and treatment because:

5

(a) The parents, or other persons legally responsible for the care and support of the child or person seventeen years of age, *neglect* or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being…

(emphasis added). "Neglect" is also defined in Section 210.110 as the "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well being."

I note that Section 455.010 begins with the broadly inclusive language that abuse "includes but is not limited to" the categories set forth in the statute. The legislature obviously intended to give courts wide latitude in crafting orders of protection for victims of abuse, children and adults alike. However, the specific language of Section 211.031 clearly states that juvenile courts possess "exclusive original jurisdiction" in matters involving child neglect. Despite the broad language of the Child Protection Orders Act, juvenile courts, and juvenile courts alone, possess the statutory authority to address allegations of neglect of a child by parents.[3]

In the present case, the circuit court found that Dawson "neglected" Child by exposing Child to the acts of a third party found to be a credible threat. Although the court then found that the child was abused or neglected by "purposely or knowingly placing the child in fear of physical harm," incorporating language from the definition of "assault" quoted above, its finding of "neglect" is markedly similar to neglect findings commonly seen in proceedings pursuant to Chapters 210 and 211. *See, e.g.*, *In re B.D.W.*, 185 S.W.3d 727 (Mo. App. 2006) (holding that a mother's choice not to terminate her relationship with the extremely erratic and abusive father

---

[3] Although I am not aware of prior cases dealing with the jurisdiction of juvenile courts as it relates to circuit courts entering protection orders, in cases involving divorce proceedings courts have held that "the juvenile division's jurisdiction was paramount and superseded the jurisdiction of any other court" in deciding issues regarding the care and custody of a child coming under the provisions of Chapter 211. *Denton v. Denton*, 169 S.W.3d 604, 613 (Mo. App. 2005); *see also Ogle v. Blankenship*, 113 S.W.3d 290 (Mo. App. 2003).

warranted removing her children from her care); *In the Interest of L.D.R.*, 169 S.W.3d 137 (Mo. App. 2005) (holding that a father's repeated exposure of his children to the violent, erratic behavior of the mother and the likelihood that he would allow unsupervised contact between her and the children in the future was sufficient grounds for termination of parental rights); *In the Interest of C.M.K.*, 140 S.W.3d 219 (Mo. App. 2004) (holding that a mother repeatedly exposing her children to an environment where the mother and father committed acts of violence against each other was grounds for termination of parental rights); *see also Juvenile Officer v. R.O.*, 566 S.W.3d 609 (Mo. App. 2018) (affirming the termination of parental rights where a father repeatedly failed to protect his child from  physical abuse committed by his girlfriend).[4]

Conversely, where courts have found assault, the respondent directly acted against the victim to place the victim in fear of physical harm.  *See, e.g., C.L. v. Hartl*, 495 S.W.3d 241 (Mo. App. 2016) (affirming a finding of assault where the respondent had physically grabbed the victim on multiple occasion, unlawfully entered her home, and made repeated, unwanted efforts to contact petitioner); *Perren v. Perren*, 475 S.W.3d 741 (Mo. App. 2015) (affirming an order of protection and finding that the respondent assaulted the victim by punching him repeatedly).  Finally, in one case where a court considered whether the single act of a third party could constitute abuse by a parent, the answer was a clear "no."  *See Reno v. Reno*, 461 S.W.3d 860 (Mo. App. 2015) (holding, in a custody modification action, that "a claim that a third party once struck a child, without more, does not state a claim of parental abuse").[5]

---

[4] This opinion should in no way be construed as suggesting that Dawson did or did not neglect Child.

[5] Research has revealed only one case, *Juvenile Officer v. Warner*, where this Court affirmed an order of protection entered against a parent who exposed her child to abuse by others.  155 S.W.3d 855 (Mo. App. 2005).  The order of protection was against a mother who repeatedly returned a child to the home of the father and uncle, both of whom had repeatedly sexually abused the child.  However, in *Warner,* the facts were far more egregious than those present here, and the case relied on sections of Chapter 455 that have since been repealed.  Section 455.501(1), RSMo 2000, defined "abuse" for child protection orders as "any physical injury, sexual abuse, or emotional abuse inflicted

7

Despite incorporating the language from the definition of assault, the circuit court expressly found that Dawson neglected Child, but it did not find, nor was it even alleged, that Dawson did anything else to Child. Having so held, the circuit court was then outside of its statutory authority to do anything else besides dismiss the matter or transfer it to a court of competent jurisdiction, namely, a juvenile court.

Dawson seems to argue both that the circuit court lacked the authority to enter a protection order for neglect, and that the statute does not allow an order to be entered against a person for the acts of a third party. Although I agree that protection orders are not appropriate where neglect of a child is alleged or found, I would leave the question open as to whether under certain facts an order could be entered against one person for the acts of a third person. However, to the extent a party could commit assault through a third person, I note that the statute's language defining "assault" states that one must act "purposefully or knowingly." When construing a similarly worded definition of "stalking," courts have held that "[b]ecause the statute uses the word "purposely" in its definition…, Appellant is required to show intent." *S.N.L. v. A.B.*, 550 S.W.3d 514, 520 n. 4 (Mo. App. 2017) (citing *In the Interest of R.T.T.*, 26 S.W.3d 830, 838 (Mo. App. 2000) (stating that "the evidence would need to support a finding that Appellant emotionally abused Daughter by purposely (by design, intentionally, with predetermination) and repeatedly harassing her…")).

The element of intent is particularly relevant to my analysis of the present case. Despite the circuit court's incorporation of boilerplate language from the statutory definition of "assault" in finding that Dawson acted "purposely and knowingly," there is absolutely no factual finding supporting a legal conclusion that Dawson acted with intent – i.e. "by design, intentionally, with

---

on a child… by an adult household member…" The protection order in *Warner* was entered on the theory that the mother emotionally abused the child by repeatedly exposing the child to abusive relatives.

8

predetermination" - when he left Child with Grandmother. The court's statements from the bench reflect the same. Indeed, I am at a loss as to what evidence in the present case would even support such a finding. The social worker who investigated the claim that Grandmother abused the child did not find by a preponderance of the evidence that Grandmother abused child, educators at Child's school saw no evidence of abuse, and Hanger herself testified that she was planning to have Grandmother watch Child up until the day the incident occurred, a plan I presume she would not have made had she suspected Grandmother was abusive. She also stated that Child was normally enthusiastic and affectionate with both her and Grandmother when she would arrive to pick him up. The fact that he was not affectionate the day of the incident tipped Hanger off to an issue, and it highlights the fact that the incident was highly unusual. In light of this, it is virtually inconceivable that Dawson, and only Dawson, knew Grandmother was abusing Child such that he would have had the knowledge necessary to form the intent the statute requires.

In an attempt to bolster a finding that Dawson acted intentionally, both the circuit court and the majority make much of Dawson's failure to strictly adhere to the specific wording of the initial temporary order, which stated that Grandmother was not to enter Child's residence. In this case, the Child's residence included the home Grandmother shared with Dawson. The majority states that Dawson's allowing the Grandmother to continue to reside at his and Child's home while the case was pending "constituted the 'more' that was lacking in *Reno*," discussed *supra*. However, Dawson ensured that Child and Grandmother had absolutely no contact with each other by having Grandmother leave his residence for days at a time and stay with friends when he had custody of Child, a fact Dawson made no effort to hide from the court as he believed he was in compliance with the order. To the extent Dawson ensured that Grandmother and Child never

9

occupied his home *at the same time*, his technical non-compliance with the initial order would, at most, support a finding of contempt. It does not support a finding that he assaulted child.

Finally, in a case such as this where the evidence does not support the necessary finding of intent, transferring the matter to a juvenile court to investigate the possibility of neglect actually expands courts' abilities to address child abuse. This is because "intent and neglect are mutually exclusive, in that intent refers to a willful act, while '[n]eglect has been described…as 'a general and a negative proposition meaning simply the failure to perform the duty with which a parent is charged by the law and by conscience.''" *In re J.K.*, 38 S.W.3d 495, 500 (Mo. App. 2001). Where a circuit court considering an order of protection must make a finding of intent, juvenile courts considering neglect are not so constrained. Juvenile courts are thus imbued with broader statutory powers than other courts to take actions on a child's behalf where a parent's conduct endangers a child even though the parent may not intend the same. I would therefore grant Appellant's Point I.

Because I would hold that the circuit court exceeded its statutory authority in entering the protection order as discussed in Point I, I would dismiss Appellant's second point on appeal as moot, though I otherwise take no issue with the Majority's reasoning as to Point II.

_____
Anthony Rex Gabbert, Judge

10